UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RUBEN PAZ GOMEZ,

               Petitioner,

v.

YANISLEIDY REYES GONZALEZ,

               Respondent.

CASE NO. C24-5645-KKE

ORDER ON PETITION FOR RETURN OF CHILD

This matter comes before the Court on the Petition for Return of Children Under the Convention on the Civil Aspects of International Child Abduction ("Petition") filed by Ruben Paz Gomez ("Petitioner"). Dkt. No. 12. The Petition seeks the return of the minor child, ACPR, to Mexico. Petitioner alleges Respondent Yanisleidy Reyes Gonzalez ("Respondent") wrongfully removed the child to the United States in August 2023. Respondent filed an Answer opposing Petitioner's request. Dkt. No. 22. Respondent argues that the Convention does not apply because the child has no habitual residence and that, if it does apply, the child still should not be returned because there is a grave risk that the child's return to Mexico will expose her to physical or psychological harm or otherwise place the child in an intolerable situation.

This Court held an evidentiary hearing on the Petition between February 10, 2025, and February 13, 2025. Dkt. Nos. 52, 55, 57, 58. At the hearing, the Court heard testimony from Petitioner, Respondent, Carlos Israel Villanueva Quevedo (Petitioner's neighbor), Carolina

Castellanos Mejia (Petitioner's friend), Azucena Paz Gomez (Petitioner's sister), Yamile Reyes Gonzalez (Respondent's sister), and Yamilka Caballero (Respondent's friend).  The parties also entered various exhibits into evidence.  For the reasons set forth below, the Court GRANTS the Petition.

## I.   FACTUAL FINDINGS[1]

1. ACPR was born in Cuba in 2017.  Dkt. No. 54 at 2.[2]  ACPR is a dual citizen of Mexico and Cuba.  Dkt. No. 64 at 10; Exs. 5, 519.  ACPR is now a legal permanent resident of the United States.  Dkt. No. 65 at 37.

2. Respondent is ACPR's mother.  Dkt. No. 54 at 2.  Respondent is a Cuban citizen and a legal permanent resident of the United States.  Dkt. No. 65 at 37; Ex. 5.

3. Petitioner is ACPR's father.  Dkt. No. 54 at 2.  Petitioner is a resident and citizen of Mexico.  Ex. 4.

4. ACPR lived in Cuba until March 23, 2020.  Dkt. No. 54 at 2.  ACPR lived in Cuba with Respondent, Respondent's sister, Respondent's nephew, and Respondent's mother.  Dkt. No. 63 at 32, Dkt. No. 64 at 93.

5. Petitioner would travel between Mexico and Cuba for work and would live with ACPR and Respondent when he was in Cuba.  Dkt. No. 63 at 30–32.

---

[1] The Court notes that while the Federal Rules of Evidence generally apply, in hearings on petitions for return of a child, objections based on authenticity are not to be considered.  *See* 22 U.S.C. § 9005; *see also Brosselin v. Harless*, 2011 WL 6130419, at *1 (W.D. Wash. Dec. 8, 2011).

[2] The Court refers to the exhibits by number as admitted during trial and filings with the Court, including trial transcripts, by docket number.

ORDER ON PETITION FOR RETURN OF CHILD - 2

6. On March 23, 2020, Respondent and ACPR traveled to Mexico City.  Dkt. No. 54 at 2.  Petitioner had purchased round trip tickets for them.  Dkt. No. 64 at 97, Dkt. No. 66 at 9.  The purpose of this trip was for Respondent to renew her Mexican residence card which was set to expire March 30, 2020.  Dkt. No. 64 at 95; Ex. 6.  Respondent needed this card to make future travel between Cuba and Mexico easier.  Dkt. No. 64 at 95.

7. Immediately after Respondent and ACPR traveled to Mexico, commercial flights leaving Mexico were suspended due to the COVID-19 pandemic.  Dkt. No. 63 at 117.

8. From March 23, 2020, until April 2023, ACPR lived with Petitioner and Respondent in a triplex in Mexico City, Mexico.  Dkt. No. 64 at 2–3.  Petitioner's sister Azucena Paz, niece YRP, and mother lived in another part of the triplex.  Dkt. No. 63 at 82–83, Dkt. No. 64 at 102.

9. Petitioner and Respondent enrolled ACPR in preschool in Mexico City in June 2020.  Ex. 8.  ACPR attended preschool there until 2023.  Exs. 9–10.  ACPR had the same teacher and same classmates for three years.  Dkt. No. 63 at 45.

10. During her time in Mexico, ACPR also had close relationships with other children.  Dkt. No. 64 at 47.

11. In 2021, Respondent began working outside the home, selling breakfast early in the morning from a cart near the shared Mexican home.  Dkt. No. 63 at 86, Dkt. No. 64 at 103.  Petitioner sometimes joined Respondent, either helping her bring materials or simply following her, leaving ACPR alone at the home.  Dkt. No. 63 at 120; Dkt. No. 65 at 7, 81.

12. At the end of 2021 or the beginning of 2022, the Mexican airports reopened for commercial flights.  Dkt. No. 64 at 100.

13. At some point Petitioner took Respondent and ACPR's passport and identification cards, though the record is unclear as to how long these documents were retained.  Dkt. No. 64 at

ORDER ON PETITION FOR RETURN OF CHILD - 3

101, Dkt. No. 65 at 107–08, Dkt. No. 66 at 15.  Respondent received these documents back after they were expired.  Dkt. No. 64 at 101.

14. While the parties lived together in Mexico, Petitioner sexually assaulted Respondent.  Dkt. No. 65 at 17–18.  While Respondent was sharing a room and bed with ACPR, Petitioner would enter the room at night and have sex with Respondent without her consent.  *Id.*, Dkt. No. 66 at 17–18.  Respondent credibly testified that this happened on more than one occasion.  Dkt. No. 65 at 18.

15. Petitioner also took Respondent's phone from her for an unspecified period while she was in Mexico.  Dkt. No. 64 at 101; Dkt. No. 65 at 107, 116; Dkt. No. 66 at 15.

16. There is no evidence that Petitioner physically harmed ACPR.  Dkt. No. 64 at 36, 49–52; Dkt. No. 65 at 55, 95, 108; Dkt. No. 66 at 18.

17. On February 1, 2023, the parties registered ACPR for the 2023/2024 school year.  Ex. 11.

18. In April 2023, Petitioner and Respondent separated and Respondent moved out with ACPR.  Dkt. No. 63 at 57, Dkt. No. 65 at 19–20.

19. At some point between April and July 2023, Respondent began a relationship with Javier Trujillo, her now-fiancé.  Dkt. No. 64 at 70.  Petitioner had also been in a relationship with another woman that started in 2022.  Dkt. No. 65 at 19–21, Dkt. No. 66 at 45–46; Ex. 524.

20. After Respondent and ACPR moved out in April 2023, Petitioner had visits with ACPR up to three times a month.  Dkt. No. 64 at 6.

21. Petitioner last saw ACPR in person in the beginning of July 2023, when ACPR stayed with Petitioner for three days.  Dkt. No. 64 at 6.

22. Beginning in July 2023, Petitioner was unable to schedule visits or communicate with ACPR because Respondent stopped responding to his messages.  Dkt. No. 64 at 7.

ORDER ON PETITION FOR RETURN OF CHILD - 4

23. Respondent and ACPR moved to the United States in August 2023. Dkt. No. 54 at 2. Respondent did not inform Petitioner of this move. Dkt. No. 64 at 62; Dkt. No. 65 at 36, 120–21.

24. From August 14, 2023, to November 22, 2023, ACPR lived with Respondent in Albuquerque, New Mexico. Dkt. No. 64 at 61, Dkt. No. 65 at 38. They lived with Respondent's friend, Claidi Ortaz. Dkt. No. 64 at 61.

25. Petitioner became aware that ACPR was in the United States on August 20, 2023 through a photo of ACPR posted on Facebook. Ex. 14; Dkt. No. 63 at 67–68, Dkt. No. 64 at 5.

26. Petitioner unsuccessfully tried to contact Respondent through WhatsApp and social media. Dkt. No. 63 at 75. Petitioner was in communication with Respondent's sister beginning in September 2023 wherein he received limited updates on ACPR. *Id.* at 72, Dkt. No. 64 at 63, Dkt. No. 65 at 115. Petitioner was never told where ACPR and Respondent were staying. Dkt. No. 65 at 120–21.

27. In October 2023, upon the recommendation of Mexican authorities, Petitioner filed an Amber Alert identifying ACPR as abducted. Ex. 18; Dkt. No. 63 at 73.

28. In November 2023, Petitioner completed a Hague application with the Mexican Central Authority. Ex. 1; Dkt. No. 63 at 25, 70.

29. On November 14, 2023, Petitioner approved the United States Department of State to send a voluntary return letter to Respondent. Ex. 16; Dkt. No. 63 at 69–70.

30. On November 22, 2023, ACPR and Respondent moved to Tacoma, Washington with Respondent's future sister-in-law, Veronica Trujillo Villacana, and future brother-in-law, Gerardo Trujillo Villacana. Dkt. No. 64 at 61.

31. On December 5, 2023, ACPR started school in Tacoma, Washington. Ex. 20 at 10.

32. Around April or May 2024, Petitioner discovered through social media that Respondent and ACPR had moved to Tacoma, Washington. Dkt. No. 63 at 71.

33. On August 6, 2024, Petitioner filed this Petition for Return of Child. Dkt. No. 1.

## II. CONCLUSIONS OF LAW

### A. The Hague Convention

Petitioner brings this petition under the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–9011, the United States statute that implements the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 49. The purpose of the Convention is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and … to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Convention, art. 1.

Because the primary remedy under the Convention and ICARA is the return of wrongfully removed children, the Court's role does not involve making affirmative custody determinations. *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) ("It is the Convention's core premise that the interests of children in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence.") (cleaned up); *Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010) ("With a few narrow exceptions, the court must return the abducted child to [their] country of habitual residence so that the courts of *that* country can determine custody." (emphasis in original)).

### B. Petitioner Has Established a Prima Facie Case for Return of ACPR.

To establish a prima facie case for the return of a child, Petitioner must demonstrate by a preponderance of the evidence that: (1) the child at issue is under the age of 16; (2) the child had a "habitual residence" in a foreign country that is a signatory to the Convention; (3) the child was

ORDER ON PETITION FOR RETURN OF CHILD - 6

removed or retained in breach of the petitioner's custody rights under the law of the country of habitual residence; and (4) the petitioner was exercising those rights at the time of the child's wrongful removal or retention. 22 U.S.C. § 9003; Convention, art. 4.

The parties agree that ACPR is under the age of 16. Dkt. No. 54 at 2.

The parties agree that, if Mexico was the child's habitual residence, Petitioner had custody rights and was exercising those custody rights at the time of ACPR's removal from Mexico in August 2023. Dkt. No. 63 at 87–88; Ex. 3.

The parties do not dispute that the United States and Mexico are signatories to the Convention.[3]

The parties dispute whether ACPR had a habitual residence in Mexico. Dkt. No. 54 at 2. Determination of the child's habitual residence is the "central—often outcome-determinative—concept on which the entire system is founded." *Asvesta v. Petroutsas*, 580 F.3d 1000, 1017 (9th Cir. 2009) (citing *Mozes v. Mozes*, 239 F.3d 1067, 1072 (9th Cir. 2001), *abrogated on other grounds by Monasky*, 589 U.S. 68)). The term "habitual residence" was intentionally left undefined in the Convention. *Holder v. Holder*, 392 F.3d 1009, 1015 (9th Cir. 2004). A child's residence in a country may be deemed "habitual" when it is "more than transitory." *Monasky*, 589 U.S. at 76. The Court must consider "the family and social environment in which [the child's] life has developed," because a child's residence becomes "habitual" when there is "some degree of integration by the child in a social and family environment." *Id.* at 77. To avoid formalistic determinations, the question of whether a person is or is not habitually a resident in a specified country is a question of fact to be decided by reference to all the circumstances of the particular

---

[3] *See* U.S. Dept. of State, "U.S. Hague Convention Treaty Partners," available at: https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited March 14, 2025).

ORDER ON PETITION FOR RETURN OF CHILD - 7

case. *Id.* at 78–80. Facts the Court may consider include the child's age, the immigration status of the child and parents, the child's academic activities, social engagements, participation in sports, meaningful connections with people and places in the child's new country, language proficiency, and the location of the child's personal belongings. *Id*. at 78 n.3. The intention of the parents can be relevant, especially when the child is "too young or otherwise unable to acclimate." *Id.* at 78. Given that "parents will not agree about what their shared intentions were once litigation is underway," the Court must "take account of the parents' actions as well as what they say." *Norinder v. Fuentes*, 657 F.3d 526, 534 (7th Cir. 2011).

Coercion of the child or mother to remain in a location can preclude a finding of habitual residence. *See Monasky*, 589 U.S. at 78 ("But suppose, for instance, that an infant lived in a country only because a caregiving parent had been coerced into remaining there. Those circumstances should figure in the calculus."); *see also Tsarbopoulos v. Tsarbopoulos*, 176 F. Supp. 2d 1045 (E.D. Wash. 2001) (considering the emotional and physical abuse of the spouse and children to be a factor in determining whether there was a sufficient degree of acclimatization and shared intent to establish a new habitual residence).

Here, Respondent argued that Mexico is not ACPR's habitual residence because Respondent never intended to stay in Mexico. She testified that she did not bring adequate clothing or supplies when she arrived in March 2020 for a permanent move, and that she always intended to return to Cuba. Dkt. No. 64 at 96. She further testified that she came to Mexico on a roundtrip ticket, and stayed in Mexico with ACPR only because of pandemic restrictions on travel that arose immediately after their arrival and lasted for several years. *Id.* at 97, 100, 104. By contrast, Petitioner testified that Respondent came to Mexico so that he could help her financially and they could "have a life together." Dkt. No. 63 at 34. While "the intentions and circumstances of

caregiving parents are relevant considerations[,]" the Court must consider the "totality of the circumstances" in evaluating the habitual residence question. *Monasky,* 589 U.S. at 78, 71.

The evidence in the record supports a finding that ACPR's habitual residence in August 2023 was Mexico City, Mexico. ACPR was young in August 2023, having just turned six, but she was not an infant whose experience should only be determined by the experience of her parents. For three years in Mexico, ACPR went to school and had a relationship with her classmates and teacher. She also had relationships with Petitioner's family and other children her age. She celebrated holidays and participated in local cultural celebrations, and the record reflects that Petitioner and Respondent intended that ACPR would attend school in Mexico City for the 2023/2024 school year. Exs. 11–12. These facts support that ACPR's life in Mexico was not transitory.

Further, Respondent has not established that she and ACPR only lived in Mexico due to pandemic travel restrictions or Petitioner's coercion. Even if the Court found that Respondent and ACPR remained in Mexico from March 2020 to the beginning of 2022 solely due to the pandemic, ACPR nonetheless had a meaningful and non-transitory life in Mexico from the beginning of 2022 until she left in August 2023. And Respondent failed to establish that from the beginning of 2022 to August 2023 she only remained in Mexico due to Petitioner's coercion. While Respondent credibly testified that Petitioner had withheld her and ACPR's travel documents at some point during the relevant period, Respondent did not testify that she was unable to travel as a result or that lack of documentation kept her in Mexico. And while Respondent further credibly testified that she feared Petitioner, again, her testimony was not tied to any particular time period, nor did she testify that her fear of Petitioner kept her in Mexico.

To the contrary, Respondent testified that she would have stayed in Mexico had she met her fiancé before she started the paperwork to move to the United States.

ORDER ON PETITION FOR RETURN OF CHILD - 9

> Q. And what did your fiancé have to do, if anything, with your decision to relocate with [ACPR] to the United States in August 2023?
>
> A. He had absolutely nothing to do with that. Actually, I met him when I was doing all the things I needed to do to be able to come to the United States. During the process, I was doing -- you know, he had absolutely nothing to do with my decision. Had I met him beforehand, I would not have come to the U.S. I would have stayed in Mexico, because he is a wonderful person for me, he loves me, respects me, loves my daughter, and supports us in everything possible. He was an angel coming into our lives.

Dkt. No. 65 at 31. The Court has no doubt that Respondent suffered in Mexico, and at some point decided to leave, but she has not established that only circumstances out of her control kept her and ACPR in Mexico such that ACPR's relationships and connections in Mexico should be ignored.

        This case is not like *Nisbet v. Bridger*, where the petitioner failed to establish the children habitually resided in Scotland because the court found the children did not have any friends, had not been in contact with any family, and were four and two years old at the time they left Scotland. 124 F.4th 577, 585 (9th Cir. 2024). Neither is this case like *Farr v. Kendrick*, where children who lived in Mexico for several years did not have a habitual residence in Mexico when the children had U.S. citizenship and expired Mexican visas, did not speak Spanish or attend school in Mexico, and most family lived in the United States. 824 Fed. App'x 480, 482 (9th Cir. 2020) (unpublished) (finding children were habitual residents of the United States).

        Rather, though the lack of shared parental intent makes this case a close and difficult one, the Court concludes that the totality of the circumstances supports a finding that ACPR's habitual residence is in Mexico. Therefore, the Court finds that Petitioner has established a prima facie case for return of ACPR to Mexico. *See* 22 U.S.C. § 9003.

**C.      Respondent Has Not Proven ACPR Will Face Grave Risk of Harm if She Is Returned to Mexico.**

If a petitioning party shows that the child was wrongfully removed or retained, Article 13 of the Convention provides certain exceptions to the mandate that the child be returned to his or her habitual residence.  Convention art. 13.  Article 13(b) contains an exception to mandatory return when a respondent can show by clear and convincing evidence that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  *See* 22 U.S.C. § 9003(e)(2); *see Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (clear and convincing evidence places in the "factfinder an abiding conviction that the truth of its factual contentions are 'highly probable.'") (citation omitted).  "[T]he grave-risk inquiry should be concerned only with the degree of harm that could occur in the immediate future." *Gaudin v. Remis*, 415 F.3d 1028, 1037 (9th Cir. 2005), *abrogated on other grounds by Golan v. Saada*, 596 U.S. 666 (2022).  United States courts have consistently recognized that, like the other exceptions to return of a child under the Convention, Article 13(b)'s exception for grave risk should be "narrowly drawn." *Cuellar*, 596 F.3d at 509 (citing *Asvesta*, 580 F.3d at 1020); *see also* 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986) ("This provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests … The person opposing the child's return must show that the risk to the child is grave, not merely serious.").  Here, Respondent alleges ACPR faces a grave risk of harm due to Petitioner's neglect and Petitioner's domestic violence towards Respondent.

"A respondent parent can establish a grave risk of harm from abuse where the petitioning parent has actually abused, threatened to abuse, or inspired fear in the children in question[.]" *Colchester v. Lazaro*, 16 F.4th 712, 717–18 (9th Cir. 2021) (internal quotation marks omitted). The only allegations that Petitioner directly abused ACPR concerned claims that he locked ACPR

ORDER ON PETITION FOR RETURN OF CHILD - 11

in her room when he accompanied (or followed) Respondent to her job selling breakfast items early in the morning. The record on this point is not entirely clear. Respondent testified that she learned after coming to the United States that Petitioner would lock ACPR in her room when he left to follow Respondent to work, and that ACPR would "scream." Dkt. No. 65 at 7. Respondent's sister repeated these allegations, though testified that Respondent told her about this behavior when she was still living in Mexico. Dkt. No. 65 at 109–10.

Respondent also introduced notes from three counseling sessions between ACPR and a therapist that took place in November and December 2024 in Tacoma, Washington. Exs. 520–22. Respondent testified that she sought counseling for ACPR because she was concerned that ACPR was exhibiting an inappropriate level of separation anxiety. Dkt. No. 65 at 13. All three sessions occurred in the presence of Respondent or her fiancé, Mr. Trujillo. Exs. 520–22; Dkt. No. 65 at 54, 56, 60. Excerpts of the notes repeat Respondent's allegations, and state "Mom and [ACPR] report [] when mom would go to work, dad locked [ACPR] in a room all day." Ex. 520 at 1. But this evidence conflicts with Respondent's testimony that these incidents of Petitioner locking ACPR in her room would have only occurred while Respondent was at work which was limited to the early morning hours when ACPR was sleeping. Dkt. No. 65 at 5–7.

The record further reflects that after Respondent and ACPR moved out of Petitioner's home in April 2023, ACPR had visits with Petitioner between April 2023 to July 2023, including a three-day visit where ACPR stayed with Petitioner. Dkt. No. 63 at 72, Dkt. No. 64 at 6. The record contains no evidence that these visits resulted in harm to ACPR or caused Respondent concern.

In sum, the evidence is insufficient to meet Respondent's "clear and convincing" burden to show that ACPR would face grave risk upon return to Mexico on account of abuse by Petitioner.

Turning to Respondent's testimony about the sexual abuse she suffered in the presence of ACPR, the Court determines that Respondent's testimony was credible, and finds that she has

established Petitioner sexually abused her in the presence of the child. The Court further finds that Petitioner exerted coercive control over Respondent's identity documents and phone at some point between March 2020 and April 2023. Dkt. No. 65 at 17–18, 35. These are deeply troubling facts with the potential to cause psychological harm to ACPR. *See* WASH. STATE SUP. CT. GENDER & JUST. COMM'N, DOMESTIC VIOLENCE MANUAL FOR JUDGES, G-17–G-22 (June 2016) (summarizing domestic violence and grave risk exception cases and identifying scientific studies linking domestic violence against a parent with harm to the child); *see also Rodriguez v. Zavala*, 398 P.3d 1071, 1076 (Wash. 2017) (finding a child's exposure to domestic violence between parents constituted domestic violence). Courts may find a grave risk of harm if a respondent demonstrates "[s]pousal violence … particularly when it occurs in the presence of the child." *Colchester*, 16 F.4th at 718 (listing authority).

  In this case, while the allegations of sexual assault are credible and disturbing, there is no evidence that the abuse present during the parties' relationship continued after April 2023 when the parties no longer lived together. To the contrary, the parties appeared to continue to co-parent ACPR with some level of cooperation. Dkt. No. 66 at 29–36; Ex. 31. Petitioner presented evidence of text communications with Respondent that took place after April 2023 in which the parties discussed plans for ACPR's schooling in the 2023/2024 year as well as her health. Dkt. No. 66 at 29–36; Ex. 31. Petitioner further testified that he offered to help Respondent and ACPR locate a new apartment after they moved out. Dkt. No. 66 at 29–36; Ex. 31. And Respondent's testimony that she would have stayed in Mexico had she met her fiancé earlier (Dkt. No. 65 at 31), indicates that Respondent did not live in fear in Mexico or move to the United States to flee danger to herself or ACPR. Because the relevant analysis for a grave risk defense necessarily focuses on whether the child will face harm upon return to the country of habitual residence, the lack of evidence about any grave risk at the time ACPR left is persuasive. Taken as a whole, the evidence

ORDER ON PETITION FOR RETURN OF CHILD - 13

in this case suggests that the relationship between the parties was turbulent, and at times violent, and eventually deteriorated to the point of permanent separation. While the Court in no way intends to minimize the harm suffered by Respondent arising out of the sexual assaults, the record does not support a finding of grave risk to ACPR based on the abuse of Respondent.

Finally, Respondent and her witnesses testified at length that ACPR will suffer serious psychological harm if she is separated from her mother. The Court finds this testimony credible. *See* Dkt. No. 65 at 44, 115; Dkt. No. 66 at 19. Respondent further testified that ACPR experiences stress when communicating with Petitioner since she has been in the United States. Dkt. No. 65 at 16. The Court also credits this testimony. ACPR has now been in the United States for over eighteen months. She attends school, has made friends, and has obtained legal permanent residency. Ex. 20 at 19; Dkt. No. 65 at 37. The Court is very concerned about the disruptive impact of ordering her return to Mexico, however, these concerns cannot satisfy the demanding standards for grave risk under the Convention. *Cuellar*, 596 F.3d at 511 ("The fact that a child has grown accustomed to her new home is never a valid concern under the grave risk exception…"); *see also Asvesta*, 580 F.3d at 1020–21 (error for a Hague court to consider the best interests of the child as those issues are reserved to a custody decision in the courts of habitual residence).

Accordingly, under these circumstances, ACPR must be returned to Mexico so that custody can be determined there in a manner consistent with Mexican law. The Mexican court is the proper venue in which to determine the best interests of the child and establish a custody agreement.

To be clear, this Court is not ordering that ACPR reside or travel with Petitioner. Rather, the Convention and ICARA require only that when granting a petition, the Court order return of the child to the state of the child's habitual residence. Convention at preamble ("Desiring to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence[.]"). As

ORDER ON PETITION FOR RETURN OF CHILD - 14

detailed below, the Court will require additional briefing from the parties regarding the manner in which ACPR should be returned to Mexico.

D. **Costs and Attorney's Fees**

Congress has provided that a court "ordering the return of a child" under the Hague Convention shall award "necessary expenses incurred by or on behalf of the petitioner … unless the respondent establishes that such order would be clearly inappropriate." 22 U.S.C. § 9007(b)(3). The Court reserves ruling on Petitioner's entitlement to attorney's fees. Though the Court has granted the Petition, the Court will accept briefing on Petitioner's fee request and whether granting such request would be clearly inappropriate in light of the findings in this order and the circumstances of the parties. Accordingly, the Court orders as follows:

- Petitioner shall submit any request for attorney's fees by April 11, 2025.
- Respondent shall submit any response by April 25, 2025. Respondent's submission shall address both Petitioner's entitlement to fees and any objection to the amount requested.

### III. CONCLUSION

The Petition for return of ACPR to Mexico is GRANTED.

The parties shall submit to the Court a joint proposal for the return of ACPR to Mexico. The report should address when ACPR must be returned to Mexico considering the school year ends in June, who will travel with ACPR on her return, who shall pay for the return airfare, any custody or visitation agreement upon ACPR's return to Mexico pending a Mexican court's custody determination, and any remote visitation to be implemented pending ACPR's return to Mexico. To the extent the parties cannot agree on any of these topics, each party shall list their positions in separate sections of the joint report. The joint report shall be submitted by March 24, 2025.

ORDER ON PETITION FOR RETURN OF CHILD - 15

The parties are reminded that the sealed transcripts (Dkt. Nos. 64–66) include personally identifiable information that should be redacted under Local Rule 5.2(a), including ACPR's first name and date of birth. The parties shall work with the court reporter to redact this information.

This Order is not a determination of the merits of any custody issues within the meaning of Article 19 of the Hague Convention.

Dated this 17th day of March, 2025.

Kymberly K. Evanson
United States District Judge